**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                                         |     |                    |
| --------------------------------------- | --- | ------------------ |
| JOSEPH J. RIMKUS,                       | )   |                    |
|                                         | )   |                    |
| Plaintiff,                              | )   |                    |
|                                         | )   |                    |
| v.                                      | )   | 08-cv-1615 (RCL)   |
|                                         | )   |                    |
| THE ISLAMIC REPUBLIC OF IRAN, *et al*.  | )   |                    |
|                                         | )   |                    |
| Defendants.                             | )   |                    |
|                                         | )   |                    |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

This case arises out of the horrific June 25, 1996 bombing at Khobar Towers, a military residence at the United States military base in Dharhran, Saudi Arabia. The explosion, which reduced much of Building 131 of the residential complex to rubble, killed nineteen U.S. Air Force personnel, including Airman First Class Joseph Edward Rimkus, and injured hundreds of others. In June 2006, plaintiff Joseph J. Rimkus, the father of the deceased Airman Rimkus, filed suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq*., alleging that defendants Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), and the Iranian Revolutionary Guard Corps ("IRGC") had provided material support and assistance to Saudi Hezbollah, the terrorist organization responsible for the bombing of Khobar Towers, and thus were subject to suit under the FSIA's "state-sponsored terrorism" exception, which at the time was codified at 28 U.S.C. § 1605(a)(7). This Court entered judgment against all three defendants on August 26, 2008, concluding that they "were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the

attack under their direction." *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 189 (D.D.C. 2008) (Lamberth, J.) ("*Rimkus I*").  The Court then awarded Mr. Rimkus $ 5 million in compensatory damages for pain and suffering and loss of solatium.  *Id*. at 198.  The Court denied, however, punitive damages, holding that such an award was unavailable under either § 1605(a)(7) or Pub. L. 104-208, § 589, 110 (1996), 110 Stat. 3009-1, 3007-172 (codified at 28 U.S.C. § 1605 note) (the "Flatow Amendment").  *Rimkus I*, 575 F. Supp. 2d at 199–200.

While this original suit was pending before the Court, Congress enacted the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), which, among other things, eliminated the prior state-sponsored terrorism exception by repealing 28 U.S.C. § 1605(a)(7), and created a new exception codified in its own provision at 28 U.S.C. § 1605A.  Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008).  While this new section effected a significant number of changes in the law, most importantly for these purposes the new exception provides for the recovery of punitive damages in suits based on acts of terrorism.  28 U.S.C. § 1605A(c).  Having been denied such recovery in *Rimkus I*, plaintiff now brings suit under § 1605A seeking an assessment of punitive damages against Iran, MOIS and IRGC.  For the reasons set forth below, the Court finds that plaintiff has established a proper basis for such punitive measures, and awards damages as appropriate.

## II.      PROCEDURAL HISTORY

### A.      Prior Khobar Towers Litigation

While the history of this particular action is relatively brief, the history of litigation stemming from the bombing of Khobar Towers—much of which is directly related to this action—is extensive.  In the early years of this decade, several different representatives and estates of a number of the individuals either killed or injured in the attack filed suit under §

1605(a)(7), seeking to hold Iran, MOIS and IRGC liable for the attack. After several consolidations, two primary cases emerged concerning the bombing. The first involved Paul Blais, a search and rescue coordinator enlisted in the Air Force who was severely injured in the explosion, and who—along with his mother and step-father—sought to recover damages stemming from those injuries. *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 46–51 (D.D.C. 2006). The second suit involved representatives and estates for 17 of the 19 Air Force personnel killed in the attack on the Towers. *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 248 (D.D.C. 2006) ("*Heiser I*"). Included among the plaintiffs in that case were the estate of Airman Rimkus, his mother and his siblings. *Id*. at 295–99.

Over years of litigation, the plaintiffs in both *Blais* and *Heiser* presented substantial evidence to the Court concerning the Khobar Towers bombing. In *Blais*, the plaintiffs submitted evidence concerning the investigations and opinions of Louis Freeh and Dale Watson. Mr. Freeh was the FBI Director at the time of the bombing, and under his direction the FBI "conducted a massive and thorough investigation of the attack, using over 250 agents." *Blais*, 459 F. Supp. 2d at 48. Mr. Watson was the Deputy Counterterrorism Chief of the FBI in 1996, and subsequent to the attack he became the Section Chief for all international terrorism at the Bureau. He was responsible "for day to day oversight of the FBI investigation" and has given sworn testimony concerning the results of the investigation. *Id*. In addition, Dr. Bruce Tefft, "one of the founding members of the CIA's counterterrorism bureau" and expert consultant on terrorism-related issues, was qualified as an expert and gave extensive testimony concerning the defendants' involvement in terrorist activities. *Id*. at 48–49. In *Heiser*, the evidence was even more extensive than in *Blais*, and was presented to a magistrate judge over the course of more than two weeks. *Heiser I*, 466 F. Supp. 2d at 250. Though relying on much of the same evidence as the

plaintiffs in *Blais*, the *Heiser* plaintiffs were able to present live testimony from Mr. Freeh, as well as additional statements from Mr. Watson and Dr. Tefft. *Id*. at 253–54. In addition, the *Heiser* plaintiffs presented Dr. Patrick Clawson, a participant in a Commission investigating the Khobar Towers attack and an expert on Iranian support for terrorism. *Id*. at 253. The Court qualified Dr. Clawson as an expert, and received his testimony concerning "(1) the government of Iran; (2) Iran's sponsorship of terrorism; and (3) the Iranian economy." *Id*.

Based on all of the above evidence, as well as additional documentary and testimonial submissions, the Court in both *Blais* and *Heiser* concluded that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran; the IRGC had the responsibility of working with Saudi Hizbollah[1] to execute the plan, and the MOIS participated in the planning and funding of the attack." *Id*. at 265; *Blais*, 459 F. Supp. 2d at 48 (quoting with approval Dr. Tefft's conclusion that defendants "were responsible for planning and supporting the attack on the Khobar Towers"). The Court then determined and awarded the proper amounts of compensatory damages,[2] while denying punitive damages in both cases. *Heiser I*, 466 F. Supp. 2d at 269–70;[3] *Blais*, 459 F. supp. 2d at 58–61.

## B.    *Rimkus I*

Shortly before final judgment in *Blais* and *Heiser*, plaintiff Joseph J. Rimkus, father of the deceased Airman Rimkus, initiated a separate suit against defendants by filing a Complaint seeking "damages for intentional infliction of emotional distress . . . solatium . . . and punitive damages." *Rimkus I*, 575 F. Supp. 2d at 185. Following service of the Complaint and Summons,

---

[1] Hezbollah is synonymous with "Hizbollah," which is merely a "variant transliteration[] of the same name." *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 268, 273 n.3 (D.D.C. 2007) *rev'd on other grounds*, 573 F.3d 835 (D.C. Cir. 2009).

[2] In particular, Airman Rimkus' mother, Bridget Brooks, was awarded $5 million in compensatory damages, while his brother James and sister Anne each received $ 2.5 million. *Heiser I*, 466 F. supp. 2d at 298–99.

[3] Following enactment of the NDAA, the plaintiffs in *Heiser* successfully moved to obtain awards that had been previously unavailable under the former section § 1065(a)(7), including punitive damages. *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 25–31 (D.D.C. 2009) ("*Heiser II*").

he moved the Court for default judgment, and requested that the Court take judicial notice of the earlier *Blais* and *Heiser* opinions—which had each been issued shortly after Mr. Rimkus filed suit. *Id*. at 186. Mr. Rimkus also moved into evidence substantial testimony from both proceedings. *Id*. at 186 n.2. The Court also held an evidentiary hearing, at which time Mr. Rimkus provided testimony about his relationship with his son, and the impact that Airman Rimkus' death had on him. *Id*. at 189–192.

Following this evidentiary hearing, but before the Court's opinion concerning liability and damages, Congress enacted the NDAA. That Act repealed the earlier state-sponsored terrorism exception—which formed the basis of Mr. Rimkus' suit—and replaced the exception with an entirely new and separate provision, codified at 28 U.S.C. § 1605A. Unlike its predecessor, which required plaintiffs in FSIA cases to articulate causes of action under state tort law, *see In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 46 (D.D.C. 2009) ("*In re Terrorism Litig.*") (noting that plaintiffs in this period used § 1605(a)(7) "as a 'pass-through' to causes of action found in state tort law"), § 1605A sets forth a federal cause of action. *Id*. And unlike the Flatow Amendment, which had been effectively eliminated as an independent basis for punitive damage awards in FSIA cases by the D.C. Circuit's decision in *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004), § 1605A provides that FSIA plaintiffs may recover punitive damages against foreign states. 28 U.S.C. § 1605A(c).

Principles of law concerning the retroactive application of statutes would generally have barred Mr. Rimkus from pursuing an action under the new state-sponsored terrorism exception. However, in passing the NDAA Congress gave FSIA plaintiffs in cases pending before the courts—such as Mr. Rimkus—an opportunity to have the newly-enacted provision retroactively applied to their cases. Specifically, the Act declares that

5

> [w]ith respect to any action that (i) was brought under section
> 1605(a)(7) . . . or [the Flatow Amendment] before the date of
> enactment of this Act, (ii) relied upon either such provision as
> creating a cause of action, (iii) has been adversely affected on the
> grounds that either or both of these provisions fail to create a cause
> of action . . . and (iv) . . . is before the courts in any form . . . that
> action shall . . . on motion made by plaintiffs . . . be given effect as
> if the action had originally been filed under section 1605A(c).

NDAA § 1083(c)(2).  Mr. Rimkus, however, declined to pursue this course, and the Court

proceeded under former § 1065(a)(7).  *See Simon v. Republic of Iraq*, 529 F.3d 1187, 1192 (D.C.

Cir. 2008) (holding that courts maintain jurisdiction over cases pending under § 1065(a)(7) prior

to passage of the NDAA).

By opinion dated August 26, 2008, the Court found defendants culpable for the bombing

of the residential facility at Khobar Towers, and thus liable to Mr. Rimkus for the death of his

son.  *Rimkus I*, 575 F. Supp. 2d at 193.  At that time, the Court made numerous findings of fact

concerning the involvement of defendants Iran, MOIS and IRGC in the Khobar Towers

bombing, relying principally on the evidence presented in *Blais* and *Heiser*.  *See id*. at 186–89.

The Court also evaluated the testimony of Mr. Rimkus concerning his relationship with his son,

and the impact that Airman Rimkus' death had upon him.  *See id*. at 189–93.  Based on its

findings of fact, the Court used former § 1605(a)(7) as a jurisdictional pass-through and

concluded that defendants were liable to Mr. Rimkus based on theories of civil conspiracy and

intentional infliction of emotional distress under Missouri law.[4]  *Id*. at 196–97.  The Court

granted Mr. Rimkus compensatory damages for the "severe emotional anguish and suffering" he

---

[4] The Court determined that the law of Missouri, where Mr. Rimkus was living at the time, should govern
liability after applying the District of Columbia's choice-of-law test, which "typically leads to the application of the
law of the plaintiff's domicile."  *Rimkus I*, 575 F. Supp. 2d at 196.

had suffered as a result of his son's brutal murder, awarding $ 5 million. *Id*. at 198. The Court denied Mr. Rimkus' request for punitive damages. *See id*. at 198–200.[5]

## C. This Action

Less than a month after this Court issued its opinion in *Rimkus I*, plaintiff commenced the separate, related action based on the same facts as that case but proceeding under § 1065A. Complaint, Sep. 19, 2009 [1]. In the Complaint, plaintiff re-alleges the same basic facts that had been found by the Court in *Rimkus I*, and sets forth an "Action for Damages Under 28 U.S.C. § 1605A(c)." *Id*. at 1–6. To support this claim, plaintiff alleges, *inter alia*, that "Iran and other defendants provided material support and resources . . . which caused and facilitated the terrorist bombing," *id*. at ¶ 26, that the bombing "was an extrajudicial killing within the meaning of 28 U.S.C. § 1605A," *id*. at ¶ 29, and that plaintiff suffered injuries as a "direct and proximate result" of the defendants' conduct. *Id*. at ¶¶ 30–31. Plaintiff seeks $ 2 billion in punitive damages in relief. *Id*. at 8.

Plaintiff served copies of the relevant papers, along with translations, by diplomatic channels through the U.S. Department of State, as required by 28 U.S.C. § 1608(a)(4). According to the diplomatic note, service was effected September 28, 2009. Return of Service/Affidavit, Jan. 19, 2010 [12].[6] Under the terms of § 1605A, defendants had 60 days from that date—until November 30, 2009—to respond. 28 U.S.C. § 1608(d). In early 2010, after none of the defendants had appeared or responded to the Complaint, the Clerk of the Court

---

[5] In denying the request for punitive damages, the Court noted that the newly-enacted NDAA provided punitive relief for FSIA claimants, but that Mr. Rimkus had not requested that the provision be retroactively applied to his case. *Id*. at 199 n.5.

[6] The letter from the Department of State indicating that service has been effected states that service was effected on September 28, 2010. Return of Service/Affidavit at 1. However, that letter was sent on January 14, 2010, *id*.—rendering a subsequent date of service impossible. More importantly, the diplomatic note transmitted with the letter—which is the document required by statute, 28 U.S.C. § 1608(a)(4)—indicates that service was made on September 28, 2009. Return of Service/Affidavit at 3. Based on this documentation, as well as counsel's sworn statement that service was made on September 28, 2009, Affidavit for Default, Jan. 22, 2010 [13], the Court finds that service was effective as of September 28, 2009.

entered default.  Clerk's Entry of Default, Jan. 25, 2010 [14].  Plaintiff subsequently requested that this Court take judicial notice of the proceedings in *Blais*, *Heiser*, and *Rimkus I*, and moved for default judgment.  Motion for Default Judgment, May 16, 2010 [17].  Based on that motion, the record, and facts available for judicial notice, the Court makes the following findings of fact and conclusions of law.

## III.  FINDINGS OF FACT

Default was entered by the Clerk of the Court on January 25, 2010.  However, prior to entry of a final default judgment, the FSIA requires that the Court evaluate plaintiff's case to ensure that he has "establishe[d] his claim or right to relief by evidence that is satisfactory to the court."  28 U.S.C. § 1608(e).  This requirement imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as true, and obligates courts to "inquire further before entering judgment" against parties in default.  *Oveissi*, 498 F. Supp. 2d at 272.

In support of default judgment, courts in FSIA cases may look to numerous evidentiary sources to satisfy their statutory obligation.  As an initial matter, a court can rely upon plaintiff's "'uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence.'"  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (alteration in original; quoting *Int'l Road Fed'n v. Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)).  Moreover, in addition to traditional documentary and testimonial evidence in the record, upon which the court may rely, plaintiffs in FSIA cases may also submit evidence in the form of affidavits.  *Blais*, 459 F. Supp. 2d at 53 (citing *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006)).  Finally, a court may "'take judicial notice of related proceedings and records in cases before the same court.'"  *Valore*, 700 F. Supp. 2d at 59 (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50–51 (D.D.C. 2009)).  Here,

plaintiff relies entirely on this final form of evidence in support of his motion for default judgment.

### A.  Judicial Notice of Prior Related Cases

Federal Rule of Evidence 201(b) permits courts to take judicial notice of facts that are "not subject to reasonable dispute" and that are "either (1) generally known within the territorial jurisdiction . . . or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Courts may take such notice whether it is requested by the party or not.  *Id*. at 201(c)–(d).  This ability to take notice of adjudicative facts extends to judicial notice of court records in related proceedings.  29 Am. Jur. 2d *Evidence* § 151 (2010); *see also Booth v. Fletcher*, 101 F.2d 676. 679 n.2 (D.C. Cir. 1938) ("A court may take judicial notice of, and give effect to, its own records in another but interrelated proceeding . . . ."); 2 McCormick on Evid. § 332 (6th ed. 2009) (noting that principle permitting courts to take judicial notice of current proceeding "is equally applicable to matters of record in the proceedings in other cases in the same court").  Because of the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings.  *See, e.g.*, *Murphy v. Islamic Republic of Iran*, ___ F. Supp. 2d ___, No. 06 Civ. 596, 2010 U.S. Dist. LEXIS 101250, at *11 (D.D.C. Sep. 24, 2010); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50–51 (D.D.C. 2009); *Heiser I*, 466 F. Supp. 2d at 267.

The difficult issue concerning judicial notice of prior proceedings is the effect of that notice.  In particular, a significant question arises concerning whether courts taking notice of prior proceedings may do so for the purpose of accepting the truth of the earlier court's findings and conclusions.  While the D.C. Circuit has not had occasion to consider this issue, Courts of

Appeals in several circuits have considered the issue and—while not issuing any *per se* rule— have generally agreed that judicial notice of such findings and conclusions is improper. *See Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *11 (collecting cases).

The rationale supporting this consensus is straightforward: Suppose the parties to a case dispute whether a car at issue was blue or red. The Court, based on the evidence before it, makes a finding that the car was blue. While that finding may control the resolution of the dispute before the Court, the finding cannot, in fact, make the car blue. *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) ("Although these findings [that Jones refused to come to work] support [the judge's] denial of the motion before him, they do not indisputably establish that Jones refused to work."). In short, judicial findings are probabilistic determinations based upon a limited set of data points—the evidence before the Court—they are not indisputable facts. For this reason, courts have generally concluded that "[f]indings of fact by a judge are hearsay and not subject to any exception enumerated by the Federal Rules of Evidence." *Ahtridge v. Aetna Cas. & Sur. Co.*, 474 F. Supp. 2d 102, 110 (D.D.C. 2007) (citing *Jones*, 29 F.3d at 1554).[7]

The benefits of judicially noticing related proceedings in FSIA cases would be essentially nullified if hearsay principles prevent courts from using the prior findings of fact in subsequent litigation. Thus, when evaluating this concern, the Court must be mindful that the statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack. *Brewer*, 664 F. Supp. 2d at 54. Rather, the requirement was intended to ensure that the courts give proper deference to the political branches' predominant role in foreign affairs by pausing to ensure the validity of their

---

[7] These concerns are further amplified where, as here, the judicial findings in the earlier cases were made in instances of party default, and thus were not reached by the Court after the benefit of a full and fair adversarial process. *See Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 20 (D.D.C. 2001) ("[F]indings of fact during this type of one-sided hearing should not be given a preclusive effect.").

actions before undertaking the substantial step of piercing sovereign immunity and entering

judgment against a foreign state. Mindful of these interests, courts in FSIA litigation have

adopted a middle-ground approach that permits courts in subsequent related cases to rely upon

the evidence presented in earlier litigation—without necessitating the formality of having that

evidence reproduced—to reach their own, independent findings of fact in the cases before them.

*See Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *11 ("[T]he Court may

review evidence considered in an opinion that is judicially noticed, without necessitating the re-

presentment of such evidence."). This is permissible because the validity of judicial records is

generally "not subject to reasonable dispute," and such records are perfectly capable of

establishing the type and substance of evidence that was presented to earlier courts. The

objective issue of what that evidence was—rather than the subjective determination of what that

evidence means—is thus a proper exercise of judicial notice.

### B. Relevant Findings of Fact

Mr. Rimkus' suit arises out of an event—the bombing of Khobar Towers in 1996—that

has been the subject of several previous FSIA actions before this Court, and in support of his

allegations he asks this Court to take judicial notice of the evidence and findings of related

litigations. Bearing in mind the parameters for judicial notice in FSIA actions set forth above,

the Court takes notice of the evidence presented in *Blais*, *Heiser I*, and *Rimkus I*, and—based on

such evidence—renders the following findings of fact:

*Joseph E. Rimkus*

Documentary evidence establishes that Airman First Class Joseph Edward Rimkus was a

22 year-old naturally-born citizen of the United States at the time of his death. *Rimkus I*, 575 F.

Supp. 2d at 186. At that time he was a trained weapons technician attached to the 58th Fighter

Squadron at Eglin Air Force Base in Florida, and was on assignment in Dhahran, Saudi Arabia. *Id*. While stationed in Dhahran, he resided in Building 131 of the Khobar Towers complex. *Id*. at 187. Documents demonstrate that Airman Rimkus, as well as the entire U.S. deployment in the region, was in Saudi Arabia on a peace-keeping mission with the consent of the host country. *Blais*, 459 F. Supp. 2d at 47.

### Defendants

Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), continuously since January 19, 1984." *Id*. (internal quotations omitted). Defendant MOIS is the secret police and intelligence organization of Iran. It has been previously characterized by the Court as both a "division of the state of Iran," *Valore*, 700 F. Supp. 2d at 65, and a "conduit for [Iran]'s provision of funds to Hezbollah." *Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *16. Defendant IRGC has been described by expert testimony as "a non-traditional instrumentality of Iran" that acts as "the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran." *Blais*, 459 F. Supp. 2d at 47.

### The Attack on Khobar Towers

In both *Blais* and *Heiser*, testimony was received from multiple individuals concerning the investigation into the history and causes of the Khobar Towers bombing. This testimony included that of Louis Freeh, the FBI director at the time of the attack, and Mr. Watson, a chief in the counterterrorism division of the FBI who oversaw the day-to-day investigation of the bombing. *Id*. at 48. Their testimony established the following record of the event:

Shortly before 10 p.m. on June 25, 1996, a large gasoline tanker pulled up to the perimeter wall of the Khobar Towers complex. After the vehicle came to a stop, the driver of the tanker leapt out of the truck and into a waiting car, which sped from the scene. *Id*. at 47. Though the truck did not go unnoticed by guards atop Building 131—the building nearest the parked tanker—less than 20 minutes after arriving, the truck exploded with a force equivalent of 20,000 pounds of TNT. At the time, this was the largest non-nuclear explosion to have ever occurred. *Id*. at 47–48. Rocked by the explosion, the near face of Building 131 was torn from the foundation and fell away, while the remaining structure was largely reduced to rubble. Nineteen United States Air Force personnel—including Airman Rimkus—were killed in the horrific attack. *Id*. at 48.

*Iranian Involvement in the Khobar Towers Bombing*

In addition to establishing a record of the Khobar Towers bombing, Messrs. Freeh and Dale also investigated the parties responsible for the brutal attack. That investigation—which was conducted using over 250 agents, lasted over five years, and led to numerous criminal indictments—resulted in the following findings:

The individuals involved in the attack referred to themselves as "Saudi Hezbollah." *Id*. Recruited by Brigadier General Ahmed Sharifi, a senior official in the IRGC, the attackers worked in conjunction with IRGC and the terrorist organization Hezbollah, operating out of a terrorist base in the Bekaa Valley. *Id*. At that facility, they received supplies and funds, provided by Sharifi, who acted as operational commander for the attack. *Id*. Sharifi and Saudi Hezbollah received approval for the attack from both Ayatollah Khameini, the supreme leader of Iran at the time, and officers within MOIS, who provided the necessary intelligence to plan and execute the operation. *Id*.

Based on the results of the investigation, Messrs. Freeh and Watson concluded that the defendants were responsible for the attack on Khobar Towers. Mr. Freeh has, on numerous occasions, "publicly and unequivocally stated his firm conclusion . . . that Iran was responsible for planning and supporting" the attack. *Id.* Similarly, Mr. Watson has previously given sworn testimony "that information uncovered in the investigation clearly pointed to the fact that there was Iran, MOIS and IRGC involvement in the bombing." *Id.* (internal quotations omitted).

In addition to these former FBI investigators, the Court in the earlier proceedings also heard testimony from two expert witnesses concerning not only Iran's involvement in the Khobar Towers attack, but also related to defendants' support for Hezbollah specifically, and terrorism more generally. In *Blais*, the Court heard testimony from Dr. Bruce Tefft, who was a founding member of the CIA's counterterrorism bureau, works as a consultant on terrorism, and has been qualified as an expert in numerous terrorism-related cases in this jurisdiction. *Id.* at 48–49. In Dr. Tefft's studied opinion, "defendants the Islamic Republic of Iran and the [IRGC] were responsible for planning and supporting the attack on the Khobar Towers. *Id.* In *Heiser*, the Court also heard from Dr. Patrick Clawson, who was a member of a Commission investigating the event, has spoken to numerous Saudi officials about the attack, and has undertaken extensive academic research on the subject. *Heiser I*, 466 F. Supp. 2d at 253. Dr. Clawson testified both that "the government of Iran formed the Saudi Hezbollah organization" and that "the IRGC was responsible for providing military training to Hezbollah terrorists as to how to carry out a terrorist attack." *Id.* He concluded that "the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction." *Id.*

*Iranian Support for Terrorism*

In *Heiser*, Dr. Clawson also testified as to the extent of the defendants' support for state-sponsored terrorism. He concluded that, at the time of the Khobar Towers attack, Iran spent "an estimated amount of between $ 50 million and $ 150 million on terrorist activities." *Id.* Subsequent to the *Heiser I* opinion, Dr. Clawson—in a recent FSIA case concerning the 1983 bombing of a U.S. Marine barracks in Beirut, Lebanon—estimated that today Iran provides between $300 million and $500 million annually in support of terrorist activities. *Valore*, 700 F. Supp. 2d at 88.

## IV.    CAUSE OF ACTION

Before turning to whether the above findings-of-fact establish plaintiff's legal right to relief, the Court must address the threshold issue of whether plaintiff may properly maintain a cause of action under the FSIA while seeking only punitive damages. The Court concludes that because plaintiff has set forth the proper elements of a claim under FSIA in the Complaint, and has sought and been awarded compensatory damages in a prior action, his suit here may proceed.

### A.    Plaintiff's Cause of Action

The first issue is whether plaintiff, by seeking only punitive damages in his Complaint, has pleaded a proper cause of action. It is a well-established principle that "punitive damages is not an independent cause of action." *Botvin v. Islamic Republic of Iran*, 604 F. Supp. 2d 22, 25 (D.D.C. 2009) (internal quotations omitted); *see also Iacangelo v. Georgetown Univ.*, 580 F. Supp. 2d 111, 114 (D.D.C. 2008) (concluding that "it is appropriate to dismiss plaintiffs' free-standing punitive damages claim as improperly pled"). Rather, a plaintiff must set forth an independent claim—generally sounding in intentional tort or strict liability—for which punitive damages may be an appropriate *remedy*. *See* Restatement (Second) of Torts § 908 cmt. c (1979) ("It is essential, however, that facts be established that, apart from punitive damages, are

sufficient to maintain a cause of action.").  In other words, a plaintiff must always be mindful in his pleadings that an important distinction exists between the cause of action or claim, and the remedy he seeks.

The Complaint in this case respects this important distinction.  In *Botvin* and *Iacangelo*, each plaintiff brought a "punitive damages claim," which did not allege a separate tort or other cause of action for which an award of punitive damages was appropriate, but instead merely asserted that defendants' behavior warranted punitive measures.  By contrast, plaintiff here has specifically alleged each element in the federal cause of action provided by § 1605A.  *See* Complaint ¶¶ 24–33 (alleging foreign state actions leading to extrajudicial killing that caused harm to plaintiff in satisfaction of § 1605A(c)).  Plaintiff then seeks only punitive damages in relief—an appropriate approach.  *See* Restatement (Second) of Torts cmt. b (1979) (noting that to seek punitive damages "a cause of action for the particular tort must exist").

Though the Complaint is sufficient in this regard, the Court pauses here to emphasize that as a general matter it is not enough that FSIA plaintiff simply lay out the five elements of liability under the state-sponsored terrorism exception.  Section 1605A sets forth the following elements as making up the federal cause of action: (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of materials support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or an official, employee, or agent of the foreign state if the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. §§ 1605A(a)(1) & (c).  However, the elements of "causation" and "injury" require more than simply alleging that an act "caused harm."  Rather, these elements demand that a plaintiff set forth sufficient facts that not only establish causation as a factual

matter, but that also demonstrate the culpability and liability of the defendant as a matter of law. As this Court has previously stated: "When viewed together, the third and fourth elements of this FSIA-created general cause of action require plaintiffs to prove a theory of liability under which defendants cause the requisite injury or death." *Valore*, 700 F. Supp. at 73. In other words, plaintiffs in § 1605A actions—whether seeking solely punitive damages or pursuing compensatory relief as well—must articulate the justification for such recovery, generally through the lens of civil tort liability.

In pursuit of this task, the Court—and many others—have already grappled with numerous theories of recovery available to plaintiffs generally under § 1605A's state-sponsored terrorism exception. Specifically, subsequent to the passage of the NDAA and the retroactive application of §1605A courts have, *inter alia*, articulated the proper scope and limits to a cause of action for intentional infliction of emotional distress under the FSIA, *Valore*, 700 F. Supp. 2d at 78–80, discussed the invocation of the traditional torts of assault and battery, *Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *54–56, and upheld claims for wrongful death under § 1605A. *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22–23 (D.D.C. 2009). Thus, in addition to looking to "well-established principles of law" found in restatements and other leading treatises, *In re Terrorism Litig.*, 659 F. Supp. 2d at 61, the Court emphasizes that plaintiffs in the future should pay close attention to the scope and nature of legal theories of recovery under the new state-sponsored terrorism exception, as they continue to develop.

Here, plaintiff's Complaint does not clearly articulate a particular theory of recovery, but rather alleges facts necessary to establish the five basic elements of a cause of action under § 1605A. The Court, however, will not exalt form over substance to dismiss plaintiff's action. At base, plaintiff's claim in this case is one for recovery of damages under the FSIA for the brutal

murder of his son, and, as seen *infra* Section V.C, such an allegation states a valid cause of action. The fact that plaintiff does not expressly set forth a prototypical common law cause of action will therefore not defeat his claim for relief. Indeed, numerous courts have held that plaintiffs, while setting forth an improper separate claim for punitive damages, may still pursue such damages as remedies for their proper causes of action. *See e.g.*, *Park v. Hyatt Corp.*, 436 F. Supp. 2d 60, 66 (D.D.C. 2006) (noting that "punitive damages are not an independent cause of action" but treating plaintiff's claim for punitive damages "as part of an ad damnum clause"); *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 108 n.18 (D.D.C. 2004) ("This Court has found many cases where punitive damages have been plead as a separate claim and cannot conclude this tactic warrants the denial of an award of punitive damages). The Court here shall do the same, but would urge future plaintiffs in all § 1605A actions—whether related to prior § 1605(a)(7) judgments or not—to clearly articulate the theories of recovery in future actions.

B.      **Failure to Plead Compensatory Damages**

In addition to the pleading issue, the Court must consider a separate legal question: whether plaintiffs can recover punitive damages in a suit in which they have asserted no compensatory (or even nominal) damages. With respect to actions brought pursuant to NDAA § 1083(c)(3), this appears to be an issue of first impression.

As a general rule in dealing with substantive claims under § 1605A, the Court "will rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions." *In re Terrorism Litig.*, 659 F. Supp. 2d at 61. Here, however, this approach yields no clear answer.

On the one hand, the Restatement suggests that "[a]lthough a defendant has inflicted no harm, punitive damages may be awarded because of, and measure by, his wrongful purpose or intent." Restatement (Second) of Torts § 908 cmt. b (1979); *see also id*. at § 908 cmt. c ("Punitive damages are today awarded when there is substantial harm and when there is none."). This approach—which does not focus on the harm that befalls the plaintiff—is consistent with the central purposes of punishment and deterrence that punitive damages seek to achieve. *See id*. at § 908(1) (noting that punitive damages are "awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future"). Thus, some federal courts have declared that "[t]here is no established federal common law rule that precludes the award of punitive damages in the absence of an award of compensatory damages." *People Helpers Found. v. City of Richmond*, 12 F.3d 1321, 1326 (4th Cir. 1993); *see also La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 301 (5th Cir. 2000) (same).

On the other hand, since the writing of the Restatement (Second) of Torts in 1979, there has been a sizable trend, capturing the vast majority of states, moving away from stand-alone actions for punitive damages in favor of a requirement that a plaintiff must also establish a right to compensatory relief. A modern survey indicates that almost 40 states' courts have expressly held that punitive damages may not be awarded in the absence of proof of compensatory damages, and that even the other states appear to, at least, demand some showing of nominal damage. Richard C. Tinney, *Sufficiency of Showing of Actual Damages to Support Award of Punitive Damages – Modern Cases*, 40 A.L.R.4th 11 § 3 (2010) (collecting cases). Indeed, the trend is so pervasive that the survey's author concludes that "[t]he general rule that punitive damages may not be awarded unless the party seeking them has sustained actual damage is accepted universally." *Id*. at § 2[a].

Thankfully, the Court need not resolve this issue here.[8] Having already determined that the Court can take judicial notice of prior cases related to the 1996 bombing of Khobar Towers, *see supra* Section III.A, the Court cannot ignore the prior action brought by Mr. Rimkus. As discussed above, in *Rimkus I* plaintiff sued defendants Iran, MOIS and IRGC under former § 1605(a)(7) for the provision of military support to Saudi Hezbollah that led to the bombing of Khobar Towers and subsequent death of his son. *Rimkus I*, 575 F. Supp. 2d 181, 185 (D.D.C. 2008). The Court found that defendants were liable under theories of civil conspiracy and intentional infliction of emotional distress, *id.* at 196–97, and awarded $ 5 million in compensatory damages. *Id.* at 198.

Though this action here is a distinct suit based upon a subsequent statute, it does not involve a separate claim in legal terms. Restatement (Second) of Judgments cmt. c (1982) ("That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims."). In other words, plaintiff here is not a claimant seeking an award of punitive damages without any showing of actual harm—the activities of defendants were directly responsible for the bombing of Khobar towers, and as a result Mr. Rimkus lost his son. This case therefore does not implicate the concerns of those states that demand a showing of compensatory damages to ensure that a civil

---

[8] In addition to the issue of whether punitive damages are available in the absence of compensatory damages as a matter of principle, the Court might also look to the FSIA and NDAA to determine whether the statute permits punitive damages in stand-alone actions. "Under federal common law, punitive damages are recoverable in the absence of actual damages where authorized by statute." *Orange Blossom Ltd. P'ship v. S. Cal. Sunbelt Developers, Inc.*, 608 F.3d 456, 465 (9th Cir. 2010). Thus, courts have held that compensatory damages are not a prerequisite for punitive damages under a number of federal statutes. *See, e.g.*, *Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 357 (2d Cir. 2001) ("An award of actual or nominal damages is not a prerequisite for an award of punitive damages in Title VII cases."); *Basista v. Weir*, 340 F.2d 74, 85–88 (3d Cir. 1965) (permitting punitive damages in § 1983 action absent claim for compensatory damages); *Boehner v. McDermott*, 541 F. Supp. 2d 310, 315 (D.D.C. 2008) (holding plaintiff entitled to statutory and punitive damages under federal wiretapping statute absent claim for compensatory damages). Here, the statutory language is ambiguous at best, as the only statement concerning recovery is a declaration that damages under the FSIA "may include economic damages, solatium, pain and suffering, and punitive damages. 28 U.S.C. § 1605A(c). For the reasons discussed above, however, the Court need not resolve this question at this time.

wrong worthy of punishment has been committed before permitting punitive damages. *See, e.g.*, *Kirk v. Denver Pub. Co.*, 818 P.2d 262, 265 (Colo. 1991) (noting that claims for punitive damages contemplate tortuous conduct which is evidenced by compensatory damages). *Rimkus I* plainly establishes that a civil—indeed, an inhuman—wrong has occurred. The Court thus does not hesitate to permit plaintiff to pursue punitive damages here.

## C.      Congressional Intent

Finally, permitting plaintiffs to pursue related actions solely for punitive damages under § 1605A is consistent with Congress' vision in passing the NDAA. As has been previously explained, the NDAA not only permits new suits to be brought under § 1605A, but also makes provision for retroactive application of the new state-sponsored terrorism exception by providing two procedural mechanisms for plaintiffs in these cases. First, the Act permits plaintiffs in actions "before the courts in any form" to move to treat their cases as though they had been filed under § 1605A, or to re-file their actions entirely under § 1605A, if within the prescribed limitations period. NDAA § 1083(c)(2). As this Court has explained, "this subsection . . . concerns a relatively narrow category of prior cases, all of which are probably best characterized as pending cases." *In re Terrorism Litig.*, 659 F. Supp. 2d at 63. Alternatively, the NDAA provides that plaintiffs may bring a new action "arising out of the same act or incident" of a prior action that was "timely commenced," if brought within 60 days of "the date of the entry of judgment in the original action." NDAA § 1083(c)(3). Such actions "enable[] plaintiffs who achieved final judgments under the former terrorism exception, § 1605(a)(7), to pursue new federal causes of action under § 1605A." *In re Terrorism Litig.*, 659 F. Supp. 2d at 64.

In creating these two mechanisms, Congress placed a limitation on the use of § 1083(c)(2) for cases already pending in court. Specifically, plaintiffs who move to have §

1605A retroactively applied to their pending action must demonstrate, *inter alia*, that their

current action "has been adversely affected on the grounds that either or both [the state-

sponsored terrorism exception or the Flatow Amendment] fail to create a cause of action."[9]

NDAA § 1083(c)(2).  In effect, Congress permitted plaintiffs in already pending cases to move

from the former terrorism exception to § 1605A *only* where they would otherwise be hampered

by the prior provisions applicable to their original suit.  *See Botvin*, 604 F. Supp. 2d at 25–26

(denying motion to proceed under § 1605A because plaintiffs could successfully pursue common

law claims under § 1605(a)(7)).

In contrast, the NDAA does not contain any similar limitation for plaintiffs pursuing

cases under § 1605A that are related to cases previously litigated to final judgment under former

§ 1605(a)(7).  This omission is of critical importance, as Congress was plainly aware at the time

of enactment that numerous cases had been successfully litigated to final judgment in favor of

plaintiffs under the previous exception.  *See* H.R. Rep. No. 110-477, at 719–20 (2007) (Conf.

Rep.) (discussing methods of collection employed by plaintiffs that had obtained judgments

under § 1605(a)(7)).  The failure to limit actions under § 1083(c)(3) in the same manner as

pending actions thus represents Congress' determination that plaintiffs who had been successful

under the prior state-sponsored terrorism exception should still be allowed to bring related

actions under § 1605A.  The only reasonable explanation for allowing such actions, moreover, is

to ensure that plaintiffs who had obtained compensatory relief against terrorist-defendants could

return to seek punitive damages against those same defendants—a goal keeping Congress'

---

[9] The Court has previously determined that this set of cases would capture those in which the plaintiffs seek punitive damages under § 1605(a)(7) or the Flatow Amendment, but would be unsuccessful.  *In re Terrorism Litig.*, 659 F. Supp. 2d at 64 ("[T]his Court reads the requirement that the prior actions must be adversely impacted . . . to include those instances in which plaintiffs failed to recovery punitive damages.").

emphasis on the inclusion of punitive damages in the NDAA. *See* H.R. Rep. No. 110-477, at 719 (Conf. Rep.) (emphasizing that plaintiffs may now seek punitive damages under § 1605A).

The case before the Court fits the model that Congress envisioned when passing the NDAA. Here, Mr. Rimkus has already successfully pursued an action against defendants for their heinous conduct under the former exception and obtained a judgment for compensatory relief. *Rimkus I*, 575 F. Supp. 2d at 200. Properly recognizing that the rule of double-recovery would prevent him from obtaining additional compensatory damages, *see Kassman v. American Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976) ("Where there has been only one injury, the law confers only one recovery."), Plaintiff here seeks only punitive damages. Complaint at 8. Had Congress not intended that suits such as this be allowed to proceed, it could easily have limited the use of the related action procedures in the same manner as the pending action procedures found in § 1083(c)(2). It did not. Thus, by the structure employed in the NDAA, Congress has made clear that actions for punitive damages under § 1605A—following on the heels of successful judgments for compensatory harms under § 1605(a)(7)—should be permitted.

## IV.    CONCLUSIONS OF LAW

Based on the findings of fact above, as well as the Court's determination that plaintiff has stated a valid cause of action upon which to proceed, the Court reaches the following conclusions of law:

### A.    Jurisdiction

Under the FSIA, "foreign states generally enjoy immunity from suit in U.S. courts." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 329 (D.C. Cir. 2003). The FSIA provides this immunity by denying all federal and state courts jurisdiction over suits against foreign states. 28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the

United States and of the States . . . .").  The withdrawal of jurisdiction, however, is not absolute but rather subject to certain enumerated exception—including the state-sponsored terrorism exception codified at 28 U.S.C. § 1605A.  That provision provides both original jurisdiction for Federal District Courts and waives a foreign state's sovereign immunity under specified conditions.

### 1.       Original Jurisdiction

The state-sponsored terrorism exception provides that a foreign state "shall not be immune from the jurisdiction of courts of the United States" under particular conditions.  Specifically, a court may entertain a suit under FSIA only if (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act."  28 U.S.C. § 1605(a)(7).

Here, each of these requisite conditions is satisfied.  First, the sole remedy identified in plaintiff's Complaint is punitive damages against the defendants, and thus the suit involves only "money damages." Second, defendant Iran is unquestionably a foreign state.  As to defendants MOIS and IRGC, the FSIA defines foreign state to include "a political subdivision . . . or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  In determining whether an entity falls within this definition, D.C. Circuit precedent directs the Court to examine whether that entity "is an integral part of a foreign state's political structure"; if so, it constitutes a foreign state for FSIA purposes.  *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (internal quotations omitted).  In its findings of fact, the Court determined that MOIS is a division of the state of Iran, while IRGC is an instrumentality of Iran that acts as a military arm of the government.  *See supra* Section III.B.  In such circumstances, both entities

constitute integral parts of Iran's political structure, and thus constitute a foreign state for these purposes. *See Oveissi*, 498 F. Supp. 2d at 275 (finding MOIS to constitute foreign state); *Rimkus I*, 575 F. Supp. 2d at 194 (finding IRGC to constitute foreign state). Third, the documentary evidence judicially noticed by the Court establishes that Airman Rimkus was killed in the Khobar Towers attack. *See supra* Section III.B. Fourth, the overwhelming evidence presented in both *Blais* and *Heiser* demonstrates that all three defendants, individually and collectively, planned, aided and supported Saudi Hezbollah in executing the bombing. *See id*. The Court has thus found defendants culpable for the death of Airman Rimkus in satisfaction of the FSIA's requirement that there be "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Valore*, 700 F. Supp. 2d at 66 (internal quotations omitted). Finally, the death of Airman Rimkus was not judicially sanctioned, and occurred as a direct result of the defendants' support and provision of materials. Based on these findings, the Court has jurisdiction over plaintiff's claims.

### 2.      Waiver of Sovereign Immunity

While the satisfaction of the above conditions permits a court to exercise jurisdiction over the defendants, those defendants remain immune from suit absent waiver of their sovereign immunity. Such waiver can occur voluntarily or by operation of statute. Under the state-sponsored terrorism exception, the sovereign immunity of a foreign state is automatically waived if (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . or was so designated as a result of such act, and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claims is filed under this section," (2) the claimant or the victim was, at the time of the act . . . a national of the United States [or] a member of the armed forces [or] otherwise an employee of the Government

of the United States . . . acting within the scope of the employee's employment," and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(i)–(iii).

Here, the facts support the statutory waiver of the defendants' sovereign immunity. First, Iran has been continuously designated a state sponsor of terror since January 19, 1984—more than ten years prior to the Khobar Towers bombing. *See supra* Section III.B. Second, the evidence demonstrates that Airman Joseph E. Rimkus was a United States citizen and member of the U.S. Air Force. *See id.* Finally, the brutal attack and subsequent death of Airman Rimkus occurred in Saudi Arabia and not Iran, *see id.*, and thus the FSIA's requirement that defendants be given an opportunity to arbitrate the claim is inapplicable. Accordingly, defendants' immunity is waived for purposes of being held liable for the murder of Airman Rimkus.[10]

## B. Retroactive Application of § 1605A to this Case

Because this suit would be untimely as an independent claim under § 1605A, *see* §1065A(b) (requiring a new action under § 1605A to have been commenced no later than 10 years after April 24, 1996 or "the date on which the cause of action arose"—here June 25, 1996), plaintiff must seek retroactive application of § 1605A. The NDAA provides two methods for such retroactive application—a plaintiff in a case pending under former § 1605(a)(7) may move the Court to have that case treated as if brought under § 1605A, or a plaintiff may bring a separate action under § 1605A within a specified range following final judgment in the earlier related proceeding. NDAA § 1083(c)(2)–(3).

---

[10] Plaintiff served the Amended Complaint on defendants through diplomatic channels on September 28, 2009, as authorized under FSIA, 28 U.S.C. § 1608(a)(4). Return of Service/Affidavit, Jan. 19, 2010 [12]. The Court thus has personal jurisdiction over the defendants. *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 296 (D.D.C. 2003) (Lamberth, J.) (holding that personal jurisdiction exists over non-immune foreign state where service is effected under §1608).

As discussed above, *see supra* Section II.C., plaintiff here has elected the latter method. The NDAA specifies that to invoke the related action procedure, a plaintiff must have filed the new action "not later than the latter of 60 days after the date of entry of judgment in the original action or the date of the enactment of the Act." NDAA § 1083(c)(3)(A)–(B). Here, final judgment in *Rimkus I* was entered on August 26, 2008. Less than a month later—well within the statutory period—plaintiff commenced this action on September 19, 2008. This action thus meets the statutory requirements for retroactive application of § 1605A.

### C. Liability

Section 1605A of the FSIA creates a federal statutory cause of action for acts of terrorism. Specifically, under the state-sponsored terrorism exception, a plaintiff can seek to hold a foreign state liable for (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or an official, employee, or agent of the foreign state if the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. §§ 1605A(a)(1) & (c). As discussed above, *see supra* Section IV.A, the third and fourth elements of this cause of action require a FSIA plaintiff to set forth a theory of recovery upon which a foreign state may be held liable. The Court takes each of these elements in turn.

### 1. Act

Here plaintiff has demonstrated by sufficient evidence that defendants were responsible for the brutal bombing of Khobar Towers in Saudi Arabia, which killed 19 U.S. Air Force personnel and wounded hundreds more. The actions of defendants constituted both an

extrajudicial killing and the provision of material support in satisfaction of the first element of liability.

First, the FSIA defines extrajudicial killing by reference to Section 3 of the Torture Victim Protection Act of 1991. 28 U.S.C. § 1605A(h)(7). That Act defines an extrajudicial killing as

> [(1)] a deliberate killing [(2)] not authorized by a previous judgment pronounced by a regularly constituted court [(3)] affording all judicial guarantees which are recognized as indispensable by civilized peoples.

Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note. Here, the evidence establishes that defendants Iran, MOIS and IRGC were all involved in the planning and approval of the attack on Khobar Towers. *See supra* Section III.B. Moreover, there is no evidence before this Court indicating that the attack was judicially sanctioned by any judicial body, much less a regularly constituted court respecting indispensable rights. Indeed, the actions undertaken by defendants here were in direct contravention of such indispensable guarantees. The Khobar Towers bombing thus constitutes an extrajudicial killing under the FSIA.

Second, the Act indicates that material support or resources are defined by reference to the U.S. criminal code. 28 U.S.C. § 1605A(h)(3). That definition states that support

> means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). Here, the evidence establishes, *inter alia*, that defendant IRGC provided materials and shelter for the members of Saudi Hezbollah who undertook the bombing, that defendant Iran gave financial support, and that defendant MOIS provided Saudi Hezbollah with assistance, false documentation and expert advice—all specifically for the purpose of

executing this attack. *See supra* Section III.B. These acts all clearly fall within the definition of provision of material support or resources.

Moreover, with respect to financing specifically, the Court "has determined that 'the routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes providing material support and resources for a terrorist act within the meaning" of the FSIA state-sponsored terrorism exception. *In re Terrorism Litig.*, 659 F. Supp. 2d at 42 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 19 (D.D.C. 1998)). Thus, where a foreign state routinely funnels money to a terrorist organization, "a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which the claim arises" to satisfy his obligation under the statute. *Id.* (citing *Flatow*, 999 F. Supp. at 19). Here, the expert testimony of Dr. Clawson in *Heiser* established that defendants routinely provided financial assistance to Hezbollah and other terrorist groups. Under such circumstances, they may be held liable for the acts of these groups under the state-sponsored terrorism exception.

### 2.    Actor

The Court has already determined that defendants are responsible for the provision of material support leading to the attack on Khobar Towers. In addition, defendants may be held vicariously liable for the extrajudicial killing undertaken by Saudi Hezbollah. In its findings above, the Court determined that Saudi Hezbollah acted at the behest and direction of defendants in attacking the residential facility. *See supra* Section III.B. This renders the perpetrators agents of defendants for FSIA liability purposes. *See Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *50–51 (holding that defendant foreign state may be held liable where Hezbollah agents "acted at the behest and under the operational control of defendants").

### 3. Theory of Recovery – Causation & Injury

This Court has extensively discussed the requirement imposed by the third and fourth element of the cause of action, which necessitates that plaintiff articulate a theory of recovery in this action. Here, plaintiff has done little more than allege that his son died, and that defendants—through their actions—are responsible for his death. While the Court would strongly urge future plaintiffs to carefully and diligently construct a theory of recovery for actions brought under § 1605A, the Court also will not dismiss plaintiff's claims without looking beyond the allegations to the evidence for such a theory.

In articulating a basis for culpability, the Court must be mindful that it is not operating on a blank slate, but rather works from the federal cause of action provided by § 1605A. As the D.C. Circuit Court of Appeals has explained:

> [I]t is a mistake, we think, to label actions under the FSIA . . . as 'federal common law' cases, for these actions are based on *statutory* rights. Without the statute, the claims could not arise. Of course, because these claims are based on a federal statute, their 'extent and nature' are 'federal questions' . . . But that does not, in this case, authorize the federal courts to fashion a complete body of federal law.

*Bettis*, 315 F.3d at 333. In following this guidance, this Court has subsequently explained that courts—and plaintiffs—should look "to sources such as state decisional law, legal treatises, or the Restatements in order to find and apply what are generally considered to be the well-established standards" which serve as the bases for theories of recovery under § 1605A. *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) ("*Heiser II*"). This approach adheres to Congress' intention "that the terrorism exception authorize federal courts to create coherent national standards to support this initiative of national significance." *Id.* (internal quotations omitted).

Mindful of these standards, the Court need not dig too deep to locate an obvious theory of recovery here. In *Rimkus I*, the Court determined that defendants were liable for intentional infliction of emotional distress under Missouri law, emphasizing that "the Khobar Towers bombing was intentional, extreme, and outrageous conduct by the defendants." *Rimkus I*, 575 F. Supp. 2d at 197 (citing *Heiser I*, 466 F. Supp. 2d at 286). Subsequent to the passage of the NDAA, the Court has articulated the scope of a theory of recovery based on intentional infliction of emotional distress on several occasions: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Valore*, 700 F. Supp. 2d at 77 (citing Restatement (Second) of Torts § 46(1)). Because no substantive differences exist between the federal courts' articulation of intentional infliction of emotional distress under § 1605A and the Missouri law equivalent, defendants are also liable to plaintiff in this action on this theory of recovery.

### 4. Jurisdiction

The Court has already determined that it is proper to exercise jurisdiction over defendants in this action, and that plaintiff is only seeking monetary compensation. *See Supra* Section V.A. This element is thus satisfied, and defendants may be properly held liable under the federal cause of action embodied in § 1605A for the bombing of Khobar Towers that resulted in the untimely and tragic death of plaintiff's son.

### D. Damages

The state-sponsored terrorism exception to the FSIA permits plaintiffs to seek damages which "may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A. In *Rimkus I*, plaintiff was able to achieve recovery for all but the latter form of damages and thus, as discussed above, seeks only punitive measures in this action.

"Punitive damages, only recently made available under the revised FSIA terrorism exception, serve to punish and deter" actors from committing the acts for which they are imposed. *Valore*, 700 F. Supp. 2d at 87 (citing *In re Terrorism Litig.*, 659 F. Supp. 2d at 61). In determining the proper amount of such damages, the Court evaluates four factors: "(1) the character of the defendants' act, (2) the nature and extent of the harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of defendants." *Id.* (citing *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)).

Before considering the appropriate amount of punitive damages in this case, the Court must confront an immediate concern. In *Heiser II*, punitive damages were awarded against defendants for the precise actions that are at issue in this case. 659 F. Supp. 2d at 31 (awarding $300 million in punitive damages against Iran, MOIS and IRGC for their role in the Khobar Towers bombing). The Court has previously recognized that "[r]ecurrent awards in case after case arising out of the same facts can financially cripple a defendant, over-punishing the same conduct through repeated awards with little deterrent effect . . . creating anomalous results." *Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *77 (citing *State Farm Mutual Auto Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003)).

At the same time, this Court cannot simply ignore the brutal actions of defendants in planning, supporting and aiding the execution of this horrific attack. The bombing of the Khobar Towers complex was a deliberate strike at U.S. personnel designed to inflict maximum damage and massive fatalities. This Court has previously characterized defendants actions in this regard as "nothing short of extreme, outrageous, and beyond all bounds of civil decency," *Blais*, 459 F.

Supp. 2d at 57, and noted that their intention was "the murder and maiming of American servicemen." *Rimkus I*, 575 F. Supp. 2d at 196–97. Such heinous acts cannot be ignored.

To balance these concerns, this Court has, in another suit arising out of a major terrorist attack, developed a method for assessing repeated punitive damages in FSIA litigation. *Murphy* is the latest opinion in a string of decisions by this Court concerning the liability of both Iran and MOIS for the 1983 bombing of a U.S. Marine barracks in Beirut, Lebanon. ___ F. Supp. 2d ___, 2010 U.S. Dist. LEXIS 101250 (D.D.C. Sep. 24, 2010). In that action plaintiffs sought punitive damages, and the Court was faced with the "quandary" of what to do given that "[p]unitive damages ha[d] already been awarded in *Valore*, which concerned the same incident." *Id*. at *77. The *Murphy* Court, relying on the Supreme Court's decision in *Philip Morris USA v. Williams*, 549 U.S. 346 (2007), determined that the appropriate calculation of subsequent punitive damages should be based on the ratio of punitive to compensatory damages in the earlier related case. *Id*. at *79–80. This approach, the Court held, will ensure that a punitive damage award comports with the earlier court's determination of the necessary amount needed to punish defendants and deter future actors. *See id*. at *80 ("Where injuries suffered by separate plaintiffs in a second case are of the same sort as those suffered by plaintiffs in the first, there is no reason to deviate in the second case from the conclusion reached in the first as to the ratio of punitive-to-compensatory damages."). The Court shall adhere to that same method here.

In the *Heiser* cases, the Court imposed a total compensatory damages amount of $ 291,089,966,[11] and a total punitive damages amount of $ 300 million. *Heiser II*, 659 F. Supp. 2d at 31. These awards evidence the Court's determination that, rounded to the nearest cent, $1.03 of punitive damages is necessary for every dollar of compensatory damages awarded. In *Rimkus*

---

[11] In *Heiser I*, the Court awarded a total amount of $ 254,431,903, *Heiser II*, 659 F. Supp. 2d at 23, while in *Heiser II* the Court added to that amount $ 36,658,063. *Id*. at 31.

*I*, the Court awarded plaintiff here a total of $ 5 million in compensatory damages. Applying this ratio, the Court here will award $ 5,150,000 in punitive damages.

## V.        CONCLUSION

In his earlier suit, Mr. Rimkus came to this Court seeking solace and compensation for the death of his son, and attempting to punish the perpetrators of the heinous act that lead to his death. Unfortunately, the Court was unable to institute punitive measures against the defendants based on applicable law at the time. As a result of Congress' enactment of the NDAA, courts have now been given the ability to award punitive damages in cases arising from acts of terrorism, including the damages assessed in this action. While the Court holds no hope that this measure will even begin to replace the profound loss of a son, the Court does hold out hope that these measures will help prevent even a single future parent from suffering Mr. Rimkus' tragic fate.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on November 16, 2010.